### EISENSTEIN v. FIBIGER.

(Circuit Court, D. New Jersey. April 13, 1908.)

PATENTS—INVENTION—METHOD OF FINISHING CANES.

The Eisenstein patent, No. 797,505, for a method of finishing canes of bamboo, tonquin, and reed, by coating them with a baking varnish paint and subjecting them to a temperature of 200 to 300 degrees as set forth in one claim and 240 to 300 degrees in the other for not less than three hours, is void, both because the limits of temperature stated are so wide apart as to be misleading and impracticable, and for lack of invention, the process being the same as that previously used in japanning articles of different material.

In Equity. On final hearing.

Raymond, Van Blarcom & Anthony, Andrew Van Blarcom, E. D. Fenwick, and L. L. Morrell, for complainant.

Fischer & Sanders, for defendant.

CROSS, District Judge. This is a patent suit in the usual form, and its determination involves the consideration of patent No. 797,505, issued to the complainant August 15, 1905, for a "method of finishing canes and the like, and articles produced thereby." The patent contains two claims as follows:

"1. The herein-described method of finishing bamboo, tonquin, and reed sticks which consists in coating the same in their natural state with a suitable baking varnish paint and subjecting the coated sticks to a temperature of from 200° to 300° of heat for not less than three hours.

"2. The herein-described method of finishing bamboo, tonquin, and reed sticks which consists in coating the same in their natural state with a suitable baking varnish paint and subjecting the coated sticks to a temperature of from 240° to 300° of heat for not less than three hours."

The defenses are invalidity and noninfringement. The claims are identical except that where the first requires the articles to be baked at a temperature of from 200° to 300° the second requires the baking to be done at a temperature of from 240° to 300°. In both cases, however, the baking process continues, in the language of the claims, for not less than three hours. A superficial glance at the claims makes it manifest that the inventor had no precise and exact idea of the method he was claiming. In effect the claims overlap and go far towards neutralizing each other. It is true that "from 200° to 300°" includes "from 240° to 300°," but the same would be true if the inventor had said from 150 degrees or 190 degrees to 325 degrees or 350 degrees, or any other numbers smaller and larger respectively, than those actually claimed. Furthermore, the testimony of the complainant shows conclusively that even the elastic and un-

certain limitations embodied in his claims are not practical, that is to say, one may keep well within the claims and yet not achieve a successful result. A few extracts from his testimony will show this. For instance, at one place he says, "if we do bake them in fully 300 degrees they cannot stand the heat; they burn up. It is not on the face of it, but the stick inside is charred so that it is not merchantable any more." Again, he says, "it requires over 200 degrees to bake them." "We found out exactly that we can't give the cane any more than 240 to 260 degrees." "Some days, in wet weather, it requires an hour or so more to keep them in the oven, and in dry weather it requires an hour less." Again, in response to the question, "Wouldn't 200 degrees of heat properly finish the cane" he replied, "it will give them a finish but not merchantable, they will scratch off. By handling them they chip off so that I can't put them in the market." At another place he says, "we found, after experimenting, that below 200 degrees they scratch off, and over 200 degrees, that is to say, between 240 and 260 degrees would bake them successfully to be hard, not to scratch." Again, "220 degrees might do it (get a successful result), but in order to be on the safe side we always subject them to between 240 and 260 degrees." And later in his testimony the following questions and answers appear:

"Q. How would about 290 degrees do? A. It is over 280, well they might stand 290. Q. They wouldn't stand 290? A. Well, they might stand 290 for a short while, but not 300. Q. How do you know they won't stand 300? A. Because we have seen it, we convinced ourselves."

This testimony of the complainant shows conclusively that the limitations of temperature in the claims of the patent are not practicable throughout; that the exposure of the canes to 200 degrees of heat or thereabouts is insufficient, while their exposure to a temperature approximating 300 degrees charred and ruined them so that they were rendered unmerchantable. The complainant's expert has testified upon this point to the same effect; he says:

"The highest temperature I have found expedient to employ in producing marketable japan, tonquin, and reed sticks is about 290 degrees Fahrenheit. The reason of this is not that it is impossible to procure a baking varnish which will stand this heat, but owing to the fact that the wood of bamboo, tonquin, and reed sticks is already slightly altered by the heat at 284 degrees, is already partially decomposed at 300 degrees, and at 320 degrees gives off besides methyl alcohol, acetone, and acetic acid, all of which are produced by its decomposition. I have found that it is preferable, where it is desired to bake these sticks rapidly, to not employ a temperature exceeding 275 degrees Fahrenheit, owing to the decomposition of the bamboo, tonquin, and reed sticks at any temperature much exceeding this. The fiber of the wood is not much altered in appearance at 284 degrees, but is weakened and above 300 degrees is distinctly charred."

It is manifest then that the claims are inaccurate and so vague and indefinite as to be misleading and impracticable. The claims may be followed in terms without producing a successful result. In an apparent effort to make them comprehensive, the patentee has made them so broad that they are impracticable at least without experiment. In order that claims of this character be adjudged valid, it should be possible for a person skilled in the art, keeping anywhere within their

limitations, to accomplish successfully the intended result. This however, the testimony on the part of the complainant, shows cannot be done. Notwithstanding the disclosures of the patent, the practice of the art remains almost as much a matter of experiment as it did before. The following language used by the Supreme Court in Merrill v. Yeomans, 94 U. S. 568, 573, 24 L. Ed. 235, is pertinent:

"The developed and improved condition of the patent law, and of the principles which govern the exclusive rights conferred by it, leave no excuse for ambiguous language or vague descriptions. The public should not be deprived of rights supposed to belong to it, without being clearly told what it is that limits these rights. The genius of the inventor, constantly making improvements, in existing patents—a process which gives to the patent system its greatest value—should not be restrained by vague and indefinite descriptions of claims in existing patents from the salutary and necessary right of improving on that which has already been invented. It seems to us that nothing can be more just and fair, both to the patentee and to the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent."

Aside from what has already been said, I think the patent is likewise void for want of invention. The method was such as had been for many years prior to the application for the patent in suit, successfully and generally applied in japanning articles other than "bamboo, tonquin, and reed sticks." Indeed, one of the complainant's own witnesses, who was a practical japanner, says, that he had japanned almost everything including egg shells, clay pipes, porcelain, steel, iron, and wood, and that the temperature at which such articles were baked was from 200 to 300 degrees, and that they were baked for a period of three hours and upwards, and sometimes all night, and he then adds that there was nothing new in the process as applied to the articles he had referred to. Testimony to the same effect has been given by several other witnesses, and the complainant himself admits that, if instead of the words "bamboo, tonquin, and reed sticks" the words "steel rods" were inserted in the claims of his patent, the method then described would not contain anything new, but would simply disclose the old process of japanning steel rods. It is true that the complainant says he was experimenting upon the lines of the patent for 15 years before he obtained satisfactory results. That statement is to me only explicable, however, for the reason which he himself gives, that the temperature in the oven he experimented with could not be raised to 200 degrees. The testimony cannot be read without reaching the conclusion that all that was necessary to·japan bamboo sticks was to follow the method long known and used, in japanning numerous other articles. Indeed, it appears by the testimony that, while the complainant's so-called invention was in its experimental stage, he went to two practical japanners, and they at once readily and successfully accomplished the feat, and in doing it merely proceeded as they were accustomed to proceed in japanning other articles. There was no invention, in my judgment, in applying this time-worn method to bamboo sticks. "The public cannot be deprived of an old process because some one has discovered that it is capable of producing a better result or has a wider range of use than

was before known." Lovell Mfg. Co. v. Cary, 147 U. S. 633, 634, 13 Sup. Ct. 472, 476, 37 L. Ed. 307.

In Smith v. Nichols, 21 Wall. 112, 119, 22 L. Ed. 566, it was held that "a mere carrying forward, or new or more extended application of the original thought, a change only in form, proportion, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means, with better results, is not such invention as would sustain a patent." Again, in Rynear Co. v. Evans (C. C.) 83 Fed. 696, it was held that there was no invention in making a well-known article, such as an artificial tooth crown, by the well-known process of striking up metals by the use of a series of male and female dies. Such processes were archaic at the date of the application for the patent. Thimbles, eyelets, buttons, cartridges, capsules, etc., were given as examples. So, too, in Dodge Mfg. Co. v. Ohio Pulley Works (C. C.) 101 Fed. 584, the court held that the application of glue to the abutting ends of segments of split wooden pullies was but the carrying forward of old ideas and did not amount to invention. In Pennsylvania Railway Co. v. Locomotive Truck Co., 110 U. S. 490, 494, 4 Sup. Ct. 220, 222, 28 L. Ed. 222, it was said "that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated" citing many cases. So too it was held in Miller et al. v. Foree et al., 116 U. S. 22, 27, 6 Sup. Ct. 204, 29 L. Ed. 552, that the application of an old process to the same material at a later or different stage is not patentable. In Dederick v. Cassell, 20 O. G. 1233, C. D. 1881, p. 413, the following language is used:

"The same method of ejecting substances out of presses by successive charges of material behind has been in use time out of mind. The presses for peat and brick exhibited by the defendant show it. That the substances were of hay, baled or unbaled, is not important. The method was the same. The application of it to other material would be but another use."

Brown et al. v. Piper, 91 U. S. 37, 23 L. Ed. 200, involved the consideration of a patent for preserving fish and other articles in a close chamber by means of a freezing mixture, having no contact with the atmosphere of the freezing chamber. The patent was held to be anticipated by the old process of preserving a corpse and also by the old and well-known process of freezing ice cream; and, in replying to a contention that the process had never been applied to the preservation of fish and meats, the court said at page 41:

"The answer is that this was simply the application by the patentee of an old process to a new subject, without any exercise of the inventive faculty, and without the development of any idea which can be deemed new or original in the sense of the patent law. The thing was within the circle of what was well known before, and belonged to the public. No one could lawfully appropriate it to himself, and exclude others from using it in any usual way for any purpose to which it may be desired to apply it."

Upon a careful review of the whole testimony, I think the patent cannot be sustained, for the reasons above given.

The bill of complaint will therefore be dismissed, with costs.