STILLWELL v. McPHERSON, Highway Com'r.

(District Court, N. D. New York. August 23, 1913.)

1. PATENTS (§ 36*)—EVIDENCE OF INVENTION—COMMERCIAL SUCCESS.
    While commercial success is some evidence of utility and perhaps of invention which may turn the scale in doubtful cases, it does not of itself prove invention.

    [Ed. Note.—For other cases, see Patents, Cent. Dig. § 40; Dec. Dig. § 36.*]

2. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—CORRUGATED METAL CULVERT.
    The Watson patent, No. 559,642, for a corrugated sheet metal culvert, in view of the prior art, is void for lack of patentable invention. Also *held* not infringed conceding validity, construed and limited as it must be in view of such prior art.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by McClellan Stillwell, doing business under the firm name of the Economy Culvert Company, against Frank McPherson, Highway Commissioner of the Town of Ithaca, Tompkins County, N. Y. On final hearing. Decree for defendant.

See, also, 172 Fed. 151.

Wallace R. Lane, George Mankle, and Clarence J. Loftus, all of Chicago, Ill., for complainant.

Risley & Love, of Utica, N. Y., and Bond & Miller, of Canton, Ohio, for defendant.

RAY, District Judge. The single claim of United States letters patent No. 559,642, issued May 5, 1896, on application filed February 19, 1896, to James H. Watson, of Crawfordsville, Ind., reads as follows:

"A culvert constructed of sheet metal and comprising connected cylindrical sections provided with circumferential corrugations, extending to the extremities of the sections, each section terminating at one end in a flared and at the other end in a contracted portion of a corrugation, whereby the contracted extremity of one section is adapted to fit into the flared extremity of the adjoining section to interlock the terminal corrugations, and means, as bolts, engaging the overlapping extremities of the corrugations for securing the sections together, substantially as specified."

Resolved into specific elements, we have: (1) A culvert constructed of *sheet metal* and comprising (2) *connected* cylindrical sections of sheet metal provided with *circumferential corrugations* which extend to the extremities of the sections, (3) each section *terminating* at one end *in a flared* and at the other end in *a contracted portion* of a corrugation (4) whereby the *contracted* extremity of one section is adapted to fit into the flared extremity of the adjoining section to interlock the terminal corrugations, and (5) *means,* as bolts, engaging the overlapping extremities of the corrugations for (6) securing the sections together. Leaving out the descriptive and explanatory parts of this claim and we have cylindrical sections of uniformly circumferentially corrugated sheet metal, the end of the one section enlarged or flared and that of the adjoining one contracted so as to fit into the flared end of its neighbor, and then means, as bolts or rivets, inserted at the joined ends to hold the two sections together. As the claim says "means," the two sections of corrugated pipe may be wired together. That is, in fact, we have two elements only: (1) The specified sections as to material and form; and (2) the "means," bolts, rivets, or wires for holding the two sections together. It requires two sections at least to come within the claim. Any one may use circumferentially corrugated sheet metal made into a cylinder for a culvert or any other purpose. There is no invention in such a structure; nothing new or novel. But when you desire to build a long culvert and it is impracticable to transport or even manufacture sheet iron of the required length, or when you desire ease or convenience of transportation, then, in either case, it is necessary to have joints (that is, one section capable of being united to another); and, to have a reasonably tight joint and to prevent the separation of the one section from the next, it was deemed wise to have the end of the one fit *into* the end of the other without diminishing the capacity at that point,

which is done by preserving the enlargement of the corrugation at the end of the one section and leaving off about one-half from the end of the next section, and the result is, where the one end of the one is inserted in the end of the other, they fit together, engage, and the continuity and uniformity of the corrugations is preserved or maintained, and by making suitable apertures, where these ends fit together, and inserting rivets or bolts, the two are held together under all the ordinary strains to which a culvert is subjected.  No claim can be made by Watson of the discovery of the fact that corrugated sheet iron or corrugated sheet iron pipe is stronger than the ordinary flat or smooth sheet iron or sheet iron pipe of the same thickness, as that was well known.

Watson's declared purpose was to provide a substitute "to take the place of vitrified tile now in common use for these purposes," viz., culverts and well curbing.  The superiority of this, or of any sheet metal pipe, in a culvert is:  (1) Less weight, ease of transportation, and reduction of the cost of such transportation; discarding of cement at the joints; reduction of loss by breakage; reduction of the cost of preparing the bed for the culvert and, by using corrugated pipe, lessened liability to displacement by heavy storms, rains, and washouts, and increased strength in the ability to sustain a greater weight, such as a loaded wagon.

## Prior Art.

Culverts of wood, metal, brick, stone, and concrete for conveying water under roadways, canals, etc., are very old.  In 1871 M. G. Freeman, of Illinois, took out United States letters patent No. 114,662, for "improvement in iron culverts."  It was of iron made in sections with grooves bolted together, and says the patent:

"The sections A A may be made of any size or weight and any form desired, either plain or smooth, or ribbed on one side, as shown in the drawing; or they may be ribbed on both sides, the bulge on one side against and opposite the depression on the other, said ribs giving greater strength."

This, as shown in Fig. 2 of that patent, made a corrugated tube forming ribs for giving greater strength.  And says the patent:

"When used for sewers the iron can be made very thin and at less cost than either brick or stone, and as durable as either."

It cannot be doubted that Freeman knew that his iron pipe in sections was less liable to breakage than vitrified tile pipe and could be transported in shorter sections and then bolted together.  The manufacture and use of cylindrical corrugated metallic tubes for steam boilers and other uses was old in 1887, when Samson Fox took out United States letters patent No. 365,466, for "mode of making corrugated tubing," and in which he claimed:

"The invention herein described of forming substantially cylindrical corrugated metallic tubes," etc.

And in his specifications he stated:

"I am aware that it is *not new* to form a circumferentially corrugated cylindrical tube or flue in which a flat sheet is corrugated; the edges are then brought together and riveted or otherwise attached."

It was well known in 1887, and when Fox took this patent, that such corrugations added strength to the tube.. He says:

"My invention consists in the formation of substantially cylindrical tubes or flues, specially applicable to steam boilers, though not exclusively so, in which, by the same thickness of the metal, a greater and more uniform strength against crushing or destructive strain is obtained than when the same thickness of metal is formed into a true cylinder. My invention consists in taking a sheet of steel to be formed into the tube, rolling it into a substantially cylindrical form with overlapping edges, welding the edges together in a uniform manner, and then by a suitable corrugating-machine corrugating the cylinder circumferentially into a series of uniform corrugations."

Fig. 3 plainly shows the corrugations but he did not deal with the subject of attaching one section to another. But anterior to this, and in 1872, James S. Pierson, of New York, had taken out United States letters patent No. 124,624, for "improvement in water and sewer pipes," in which he claimed:

"A pipe composed of an annularly-corrugated metal body, A, a lining, B, of hydraulic cement, and an outer coating, C, of asphalt or other water-proof material, for protecting the metal body against corrosion, substantially as specified."

These were for use aboveground and underground and the corrugations were to give added strength. He says:

"The corrugations are annularly arranged and, in addition to imparting strength and relieving the rivets which secure the seam of strain, serve to hold the lining of hydraulic cement to its place. A pipe thus made is at once cheap, light, *and capable of sustaining a very heavy pressure.*"

The cement lining when used was to protect against gases and keep the water pure, not to add strength. He dealt with the joining of one section to another, and says:

"The one end of the pipe is left bare of cement on its interior to the depth of one of the body's corrugations, or thereabout, for the purpose of receiving within such female socket, or exposed portion of the body, the flush or cemented end of an adjacent pipe section," etc.

He inserted the end of one into the end of the other and united these with cement, not bolts or rivets.

In the patent to Hugh W. Harry, No. 400,566, dated April 2, 1889, for tank, we have (quoting therefrom):

"The sides of the tank are composed of galvanized iron formed in plates, which are curved and corrugated in the direction of their curvature, and are arranged with their ends and side edges overlapping, and with their vertical joints arranged in the breakjoint manner, as shown. These plates D have their ends secured together by rivets E, so the two plates, when properly secured together, will form a complete circle, and the series of circles thus formed are secured together vertically, one above the other, until the tank has been built to the desired height. The lower edge of the bottom circular section thus provided is secured to the circular edge of the bottom of the tank by nails or tacks or other like fastenings, as shown at a; said nails or fastenings penetrating into the wooden bottom, so as to aid in securing the latter in place. The extreme lower edge of the bottom section of the tank is then bent under the ends or edges of the boards A constituting the main wooden bottom, which is thereby braced and strengthened, as shown. After the several sections have been riveted together I apply solder to all the joints, so as to make the tank water tight. It will be seen at once that I have pro-

vided a very simple tank, which can be built at a slight cost. Being constructed of corrugated metal, it possesses great strength and durability, and, being made in sections in the manner described, it can be built to any desired height, so as to have any desired capacity. The joints are all water tight, so as to prevent leakage, and the ends and edges of the sections all overlap, so as to effectually resist the strain applied thereto. The bottom is especially constructed to support the weight of the water and is prevented from becoming water soaked by the metallic plate on the upper side thereof."

The corrugated cylindrical tank may be constructed of any height, or, on its side, of any length, and the "corrugated metal culvert" of the patent in suit is a substantial duplication of that structure. Turn one of those tanks of suitable diameter for a culvert on its side, remove the bottom of course, and use it as a culvert and we have complete anticipation of the structure of the Watson patent. It is immaterial whether the cylindrical sections of corrugated metal fitting into each other, as shown here, so as to form continuity and uniformity of corrugations and double metal at the joints, caused by the overlapping, are riveted or bolted, either furnish the necessary means for uniting section to section.

In the prior art we have a variety of expedients for attaching sections of pipe, stove pipe, sewer pipe, water pipe, etc. See Allen patent, No. 186,290, of January, 1877; Dennis patent, No. 246,092, of August, 1881; and patent to Camp, No. 246,597, of September, 1881, where we find the following:

"The nature and object of my improvement are to provide a novel joint for connecting sections of metallic pipe that are to be afterward coated and lined, which, while making a close and tight joint, strengthens the united coated and lined pipe against peripheral pressure externally and internally and prevents the joints of the sections being withdrawn or spreading longitudinally or otherwise. * * * The sections of the pipe are first made in straight tubular form, and the ends intended to be joined are slipped flat one over the other, as shown in detail, Fig. 5. They are then connected with a few rivets, and the joined pipe is then carried to a beading machine of peculiar construction. (This machine is not herein described in detail, as it is embodied in another specification drawn up preparatory to making application for letters patent therefor; it being obvious that none of the ordinary beading machines can be used for beading my improved pipe, in consequence of the projecting rivets $a$ and flanges $a'$ and $a^2$.) The overlapping joints are then pressed out, forming a bead, $A$. This bead does not take up all of the overlapping metal but leaves beyond the relief-beaded portion flat flanges $a'$ $a^2$; the flange $a'$ on section $B$ surrounding and lying flat externally upon section $C$; the other flange, $a^2$, surrounding and lying flat internally against the inner face of section $B$, and so on with each succeeding section. My improved joint requires only a very small number of rivets. The pipe is then lined and coated with asphaltum, cement, or any similar composition. Fig. 2 is a sectional view of such finished pipe, wherein $f$ is the metal pipe, and $b$ $c$ represent respectively the lining and coating. Besides the advantage of my improvement as a device for joining sectional sheet metal pipe, the beaded rims, with their internal and external flanges, form strengthening ribs of overlapping metal that reinforce the pipe and protect it from circumferential pressure either externally or internally."

In the Dennis patent the sections of pipes are transported before being joined. In Allen a bead is formed on one section near the end and a flare or outward bead is formed on the other, and when the one is inserted in the other up to the bead a tight joint is formed. Add rivets or bolts and we have the structure of the Watson patent.

In view of this prior art I do not see how it can be held that the Watson patent discloses patentable invention. It was not new with Watson to use such pipes of metal or iron in culverts or to carry water and sewage underground as we have seen.

## Commercial Success, etc.

[1] It appears from the evidence that, after traveling a hard road and overcoming doubts as to utility and durability, this culvert pipe has met with considerable commercial success. Persistent effort and judicious and extensive advertising will give commercial success to many things, some meritorious and some not, but not all improvement in any line is invention; and while commercial success is some evidence of utility, and it may be of invention and has turned the scale in doubtful cases, it does not of itself prove invention. McClain v. Ortmayer, 141 U. S. 419, 428, 12 Sup. Ct. 76, 35 L. Ed. 800; Lovell Mfg. Co. v. Cary et al., 147 U. S. 623, 13 Sup. Ct. 472, 37 L. Ed. 307; Duer v. Corbin Cabinet Lock Co., 149 U. S. 216, 224, 13 Sup. Ct. 850, 37 L. Ed. 707.

I do not doubt and can well see that especially in localities where there is soft ground for considerable depths, making it difficult and expensive to get a suitable and permanent foundation for a brick, a concrete, or stone culvert, or where brick and stone are not easily found, or are expensive, this metal pipe would find a ready and an extensive sale. It was not invention to conceive the idea that such pipe would constitute an efficient and suitable culvert, and, if so, Watson was far behind in making the discovery. Doubtless users and would-be users at first doubted the strength of such pipe and its ability to sustain heavy loads passing above it. But it was not invention to discover its strength, and, if it were, others, as we have seen, had long before discovered the greatly increased strength given sheet iron pipe by adding these corrugations.

It is evident at a glance when we look at Fig. 2 of the drawings of this Watson patent in suit that the mode of uniting one section to the other is within the sphere and skill of the ordinary mechanic and does not involve mental conception amounting to invention. In the state of the art no exercise of the inventive faculties was involved. Having in view the prior art, as the Allen patent, No. 186,290, of 1877, and we observe that by cutting our corrugation in the center we have an enlarged portion, or the one half of a corrugation forming a flaring end of one section of the pipe. Cut the end of the adjoining section to be inserted in the valley between corrugations and you have a portion or end of your second section (the one to be inserted) which readily enters or fits snugly into the flaring end of the other section until the center of its corrugation reaches the elevated edge of the other section. The end of the one is inserted in the end of the other; the continuity of corrugations is preserved; you have a tight joint and at this point a double wall or thickness. Add rivets or bolts and the thing is done. It is not necessary to cut the sections or the metal sheets of which made. In making the sections the one may be made to terminate at the point of greatest diameter, while the end of

the section to be inserted is made to terminate at the point of least diameter.

In my judgment the time has not come, as much as we may desire to encourage the arts and sciences and protect the true inventor who has done so much for the growth and advancement of our country, when every demonstration of "Yankee ingenuity" or mere ingenuity of "any race or color" is entitled to be ranked and dignified as "invention." If sections of wood and metal pipe had never been united and riveted together before, the open end of the one section a little enlarged and the end of the other a trifle diminished to the end that the one should receive the other, we might properly say to the one who thought out how such union could be made:

"You are an inventor; your conception ranks as invention."

But here such structures and unions were common and well known as were rivets and bolts for holding things in place. What was done here by Watson was the obvious thing to do. Iron and steel structures and sheet metal are everywhere taking the place of wood and of brick and mortar even. Hollow iron pipes have been used to carry water for more than a century both aboveground and underground. So of lead pipes. Was it invention to bend and rivet corrugated steel or sheet metal into a circular form and use it for this purpose? Or was it invention to connect one section of such pipe with another when formed in the manner described and bolt or rivet them together to prevent their pulling apart on strain or pressure? I think not. And clearly there was no invention in the selection of sheet iron or steel for culverts or conduits for water under ground or under roadways. While the alleged popularity of this Watson culvert may be due to its greater usefulness, small cost, ease of transportation, and the readiness with which it may be put in place for use, or to the fact that it came on the market when and in localities where a substitute for a vitrified pipe or for brick or stone culverts was greatly desired and even required, such popularity and demand certainly, in view of the prior art, is not due to any patentable feature in its construction.

The primitive and old-fashioned mode of conveying water under roadways, where stone was not abundant or the soil was soft to considerable depths, was to find a hollow log in the woods, clean out the rotted portion from the interior, place it in position, and cover with dirt. If two or more sections were required, the end of one section was uniformly chamfered off so as to lessen its diameter and the end of the next section was rimmed out with ax, adz, or chisel, and then the chamfered end of the one section was inserted in the rimmed-out end of the next and a few nails held them together, or what made them more secure were a few hardwood pegs inserted in auger holes bored at the proper places. Such culverts in the old sections of our country have been supplanted largely by others, as hollow logs are scarce; there being but little timbered territory comparatively. So far as I am informed, no patent was granted for this efficient construction of which the Watson patent is but a substantial duplication; corrugated sheet metal having been substituted for wood.

Where stone was plentiful a trench was dug, stone walls erected on each side thereof and maybe flat stone were laid in the bottom, and these walls supported sills on which were placed flat stone, or plank, or hewn timber, and sometimes poles. For conveying water under roadways, plank nailed together to form an opening were used also. The old-fashioned so-called "pump logs" to convey water and extending sometimes for miles in hard ground and soft ground and through swamps and under, in, and across creeks and rivulets were in common use and in some sections of the country are to-day. Who has not seen two 2x4's nailed together bored through from end to end; the end of one section chamfered off to diminish its size and the end of the next section rimmed out so the end of the one could be inserted in the end of the other and then nails, bolts, or pins inserted to prevent their separation? Or who has not seen the small logs cut from the forest and bored through and then chamfered and rimmed respectively and united in the same way? Was it invention to select and substitute corrugated iron tubes united in the same old way? The witnesses for the complainant contend that there is no analogy whatever between sheet metal pipes, smooth or corrugated, commonly known as stove pipes made in sections and united as indicated and used to conduct or convey smoke and gases above ground, and sheet metal pipes of the same size and weight and united in the same way, but used as a culvert to convey water underground. They contend that the pipe *made to be used* as a stove pipe would always be a stove pipe and the one *made to be used* as a culvert would always be a culvert regardless of the use to which put. In other words, the *intention* of the maker would determine what it was when put in service, regardless of the use to which put. The witness said that, if made to be used as a stove pipe and used as a culvert, it would be "a stove pipe out of place," not a culvert. In short, the contention is that one who should conceive the idea that a bayonet would make a good weed digger would be entitled to a patent if it proved a popular success, and that it would be no answer to say that bayonets for use on a gun in the armies and used in fighting battles have been in common use for over 200 years. Is this a case where the transposition of a steel pike from army to farm, a far more peaceful and useful sphere of action, for use as an agricultural implement would entitle the one who conceived the idea to a patent? The first soldier whose common sense told him to use his bayonet as a spade to dig a hole and throw up a breastwork, in short dig a small rifle pit, had a conception and his idea became immensely popular and was taken up and made of practical use by many thousands when in the presence of or apprehension of the appearance of the enemy, but was he entitled to a patent because of its utility and popularity and extensive use in the army for that purpose in the absence of spades? True, the bayonet remained a bayonet, but the soldier was not entitled to a patent because he called it his spade and used it as such. Making and connecting sections of steel or iron smoke pipe is in the same art with making and connecting sections of steel or iron water or sewer pipe. Both should be "liquid tight,"

strong and durable, and the sections should be securely fastened to-
gether, forming nonleakable joints. Especially is this true in the
case of smokepipes, stove or furnace, as many householders and in-
surance companies have found to their cost. The Allen patent, No.
186,290, of January, 1877, is a good illustration of the prior art in
uniting two cylindrical sections of pipe together so as to form a strong
and a nonleakable joint and at the same time not contract the aperture
for the smoke and gases. Wherein and how much does it differ from
the pipe of the Watson patent? True, Allen did not rivet or bolt his
sections together, as he did not regard it necessary, but any one not
a mechanic can see that rivets or bolts could be easily added and that
they would give greater security against separation. Allen says:

"The object of my invention is to overcome the labor and difficulty of join-
ing together, joints of stovepipe. The figure represents the joints A and B of
pipe, which are of the usual length, size, and material; but instead of the
ends being left straight, these have one end, A, left straight, and a beaded
crease or rim, 3, turned about two inches from the end, and about one-fourth
of an inch high, and the other end of joint, 4, the edge is beaded or turned
out, forming a flaring mouth to cover about one-half of the bead or rim 3;
and when the joints A and B are pressed together the bead 4 on joint A
forces itself partly over bead or rim 3 on joint B, which forms a strong joint,
and prevents the smoke from oozing out. Besides, the joints are quickly
fitted together, as the two sharp edges do not come in contact, as they do in
other kinds of pipe. Besides, my pipe is made of the same material as other
pipe, and the same amount, and requires no extra skill, time, or tools to
make it, and hence can be made for the same money, and is much better in
every way."

Allen's beaded crease or rim 3 corresponds with the corrugation in
Watson where the small end is to be inserted, and the beaded or turn-
ed out edge of the end of the other section forming a flaring mouth
corresponds with the flaring mouth of Watson's patent formed by the
ending of the corrugation at its greatest diameter. Attention is also
directed to the Morrison patent, No. 99,459, issued February 1, 1870,
"improvement in stovepipe joints." Morrison corrugated each end of
his sections and then slipped or sprung the one within the other. He
says:

"It will be noticed that the contact is over the whole swell of the bead.
Furthermore, the bracing and stiffening form of the bead effectually prevents
warping of the ends of the rings, which ordinarily occurs by the application
of heat on sheet metal, and which, in the present instance, would destroy the
circle of the joint, and therefore prevent the easy turning of the parts when
it is desired to change the adjustment. This form of the seam or joint is
far superior to that in which a single flange of one part rests in an over-
lapping sharp-edged bead of the other, in which case any warping of the
seam or irregularity in the thin flange would interfere with the turning of
the parts."

It is evident from this, for he (Morrison) describes it, that the Wat-
son mode of connecting two sections of pipe was old. True, he makes
no mention of bolts or rivets but does provide other "means" for firm-
ly holding the sections together. Morrison also contemplated the use
of his invention in culvert or other water pipes, for he says:

"This is particularly applicable in water pipes or for other uses where
strong pipe is required."

Indeed, it is obvious that a sheet metal pipe which is to carry smoke and flame and accompanying gases will also convey water underground or aboveground, and that when put under roadways it is only necessary to see to it that the pipe is strong enough to sustain the weight and pressure, both direct and longitudinal. The longitudinal pressure on a pipe under a roadway, if deeply covered, is negligible but considerable if exposed to direct blows from the passing vehicles. No one has the hardihood to contend that these culvert sections of corrugated sheet iron are to be loosely laid in the ditch crossing the roadway and directly driven on and over. So exposed they would soon be battered out of shape, cut through, and destroyed. They are to be laid in the soil which is to be firmly packed about and on them. Under ordinary conditions they are more durable than wood, although a hollow log culvert of hemlock or pine, if kept constantly wet and not exposed to direct blows or battering, will last a century. It is, of course, desirable to substitute these iron culverts in many places as they can be made of any size desired. In time rust will destroy them. But it was not patentable invention to know what has been known and taught for a century, at least, that iron can be wrought into almost any shape and that under ordinary changeable weather conditions it is, inch for inch, stronger and more durable than wood. Brick and stone culverts, laid in cement and on a firm and enduring foundation, are far better and more durable, and this is undoubtedly true of concrete if properly mixed of first-class materials; but such culverts are, of course, more expensive. Or, as said by Freeman in his patent No. 114,662, issued May 9, 1871, for "improvement in iron culverts":

" *  *  * The sections *A A* may be made of *any* size or weight and in any form desired, either plain or smooth, or ribbed (in effect corrugated) on one side as shown in the drawing, or they may be ribbed on both sides (in effect corrugated), the bulge on one side against and opposite the depression on the other; said ribs giving greater strength. *  *  * When used for sewers the iron can be made very thin and at a less cost than either brick or stone, and as durable as either."

But all this is of little weight in this case as Watson was far in the rear, some 25 years, in discovering the increased strength of corrugated metal and the availability of sheet iron as a conveyor of water or for use as a culvert. Used on buildings (see Austin patent, No. 290,-659, of 1883) it was only necessary to increase the size and utilize it as a culvert, using heavier metal. He is presumed to have known the prior art fully, and on this assumption his conception was, if anything, that the corrugations could be availed of to make the uniting of sections easy. But he cannot be credited with this even, for Morrison, in 1870, said:

"The seams or joints between the parts (sections), to allow the free reverse adjustment of the same, are formed as follows: The oblique ends of the arms of the elbow, and also the rings or sections (of pipe), are run through a machine which produces a wide horizontal bead, *or corrugation a,* all around. The end of one ring is then slipped or sprung into the next, and so on; the bead (corrugation) of the one part striking and resting closely within that of the other part, as clearly shown in Fig. 3."

Fig. 3 is shown thus:

*B B* are the sections, and *a a* are the corrugations or beads. And I may say in passing that this mode of uniting the sections, rivets added, is the one now adopted by defendant in practice, thereby forming a better and more permanent union and a better and stronger joint.

### Infringement.

If there is any invention in the Watson patent, it lies in his mode of joining the sections. His claim is quite specific, and he says 'of his circumferential corrugations:

"Provided with circumferential corrugations extending to the extremities of the sections."

And then:

"Each section terminating *at one end* in a contracted portion of a corrugation."

And the purpose is stated thus:

"Whereby the *contracted extremity* of one section is adapted to fit into the *flared extremity* of the adjoining section to interlock the terminal corrugations."

This language may have been used to evade Morrison. Watson is limited not only by the prior art but by this specific language. He is not a pioneer in this art as we have seen and is limited to *just what he claimed* with a reasonable but limited range of equivalents. But complainant is not entitled to a construction of this Watson claim, which makes the defendant an infringer, for the reason he uses the attaching or interlocking means of the prior art. The defendant has a combination, every element of which was present in the prior art, and they are used in the old way or manner if not for the same purposes. The defendant does not join his sections in the manner described and claimed in the Watson patent, but on the other hand uses the Morrison method with a slight variation which he had the right to do without infringing Watson, even if it could be held that the Watson patent is valid, which I cannot do. Defendant has no contracted extremity at either end of either of his sections adapted to fit into the flared extremity of the adjoining section. In defendant's culvert the sections are joined by the overlapping of the whole of the terminal corrugation, a complete corrugation; one whole or complete corrugation at the end of one section being inserted within the complete or whole corrugation of the next or adjoining section. In a crowded art, where there is little room for improvement, we sometimes do find improvements which are new and useful and disclose conception of quite a high order and which, with new means or a new and novel arrangement and adaptation of old and well-known means, disclose invention or what we sometimes term "potentable invention," but this is not one of those cases. All there is of this Watson patent, in view of the prior art, is the application of corrugated sheet metal pipe of

suitable sizes and lengths to use as culverts for conveying water under roadways, etc.; and, while the idea may have been new and novel with Watson it was neither new nor novel in the art. Certain decrees entered by consent of parties and adjudging the validity of the patent are before me. "Consent decrees" do not usually enlighten the court. These are not accompanied by any opinion of the court granting them, and it is well known that alleged infringers, who are mere users, are sometimes sued, who *buy* their peace by *consenting* to a decree for an injunction without costs and are happy to be rid of the annoyance. It is also said nothing was cited against this Watson claim in the Patent Office. This shows a want of care and research there but not patentable invention. This is not the case of "a happy thought" patentable, for it was directly suggested by what had preceded it in the art to which it belongs and was in fact fairly and logically deducible from prior constructions and uses.

[2] It is therefore held that this Watson patent in suit, in view of the prior art, is void for want of patentable invention, and that conceding patentability, construed and limited as it must be in view of such prior art, the defendant does not infringe.

There will be a decree dismissing the bill, with costs.