ARLINGTON MFG. CO. v. CELLULOID CO.

(Circuit Court of Appeals, Third Circuit. September 22, 1899.)

No. 30.

1. PATENTS—INVENTION.

It is not enough to sustain a patent for a compound that it shall be novel and useful, but its production must also involve invention or discovery.

2. SAME—PYROXYLINE COMPOUNDS—IMITATION ONYX.

The Stevens & Harrison patent, No. 546,360, for a method of producing a pyroxyline compound in imitation of onyx, is void for want of patentable novelty and invention; the method described having been anticipated by the France method of making imitation agate and carnelian, and also by the method disclosed in the Mehling patent, No. 211,860, for a method of manufacturing artificial stone veneer.

**3.** SAME—ARTICLES OF CELLULOID.
  The Thurber & Schaefer patent, No. 542,452, for improvement in celluloid articles, and in the process of manufacturing the same, is void for want of invention in either the product or method of production.

Appeal from the Circuit Court of the United States for the District of New Jersey.

J. R. Bennett, for appellant.

J. E. Hindon Hyde and Frederic H. Betts, for appellee.

Before DALLAS, Circuit Judge, and BUFFINGTON and BRADFORD, District Judges.

BRADFORD, District Judge.    This is an appeal from an interlocutory decree sustaining letters patent No. 546,360, issued September 17, 1895, to Stevens & Harrison, and No. 542,452, issued July 9, 1895, to Thurber & Schaefer. Both patents are owned by the appellee.    The defenses are lack of novelty and of invention and noninfringement.    This appeal has twice been argued, by reason of the retirement of Judge Butler from the bench after the first hearing and before a conclusion was reached as to the disposition of the case.

The claims of patent No. 546,360 are as follows:

"1. The method of producing a pyroxyline compound in imitation of onyx, consisting, first, in forming the light-tinted parts in solidified strata; second, cutting through these strata across their edges; third, inserting coloring matter between the cut parts, and, fourth, solidifying the whole into blocks, shapes or masses, substantially as described.

2. The method of producing a pyroxyline compound in imitation of onyx, consisting, first, in forming the light-tinted parts in solidified strata; second, cutting through these strata across their edges; third, inserting a pyroxyline composition of a different color between the cut parts, and, fourth, solidifying the whole into blocks, shapes or masses, substantially as described.

3. A pyroxyline compound in imitation of onyx, consisting of two or more light tints in solidified strata with lines of a different color breaking through or crossing the edges of these light-tinted strata, substantially as described.

4. A rod or sheet of pyroxyline composition in imitation of onyx, consisting of two or more light tints with streaks of a darker color breaking through or interspersed with the lighter tints, substantially as described."

This patent cannot be sustained on the ground merely that the production of a pyroxyline compound in imitation of onyx or its production in the manner described in the specification was novel. It is necessary that such production should also have involved invention.    As was said in Thompson v. Boisselier, 114 U. S. 1, 11, 5 Sup. Ct. 1047:

"It is not enough that a thing shall be new, in the sense that in the shape or form in which it is produced it shall not have been before known, and that it shall be useful, but it must, under the constitution and the statute, amount to an invention or discovery."

The properties and characteristics of celluloid and other pyroxyline compounds were understood long before the date of the alleged invention.    It was known that they could be rendered plastic by heat and when in that condition moulded or pressed into such shapes or forms as might be desired.    It was also known that by the introduction of coloring matter different colors or tints could be imparted to the finished product and that by subjecting, while plastic, two or more sheets or pieces of celluloid different in color or tint to a rolling or other kneading or mixing process the different colors or tints

could be blended in such manner in the finished product as to present a variegated, veined, mottled or clouded appearance, and cause such product to imitate a variety of natural objects or substances. Indeed in the specification of the patent it is said:

"Solid or massive pyroxyline compounds, as is well known, owe their commercial importance largely to their susceptibility to coloring treatment and manipulations essential to the production of imitations of natural substances— like mottled amber, tortoise-shell, veined ivory, carnelian, &c. * * * Methods of coloring the pyroxyline compositions used are well known and it is unnecessary to describe the coloring-matter or pigments used."

In view of the prior state of the art as disclosed in the record, we do not think that either the production or the method of production of the onyx base involved invention, but rather the exercise of judgment and skill in the selection and combination of colors and in the regulation of the amount of rolling or kneading which the plastic celluloid should undergo in order to effect the desired blending of tints and shades. Was there patentable novelty or invention in the cutting of the layers or strata of the celluloid and the insertion between the cut parts of coloring matter for the imitation of the streaks or veins of the natural onyx? It appears that the complainant and its predecessor, The Celluloid Manufacturing Company, as early as 1884 manufactured and have since continued to manufacture from celluloid imitation agate and carnelian by the method described and claimed in the France application for a patent for "Improvements in Manufacture of Pyroxyline Compounds, such as Pyralin, Celluloid, etc." We quote from the application as follows:

"In practicing this invention I adopt the following method, susceptible of infinite variation, of extreme simplicity, and by which every possible form of agate may be imitated with great accuracy. I first prepare sheets of two colors, mottled in the manner commonly used in known processes for imitating gray agate, a description of which will fully explain my invention as applied to all. When sufficient sheeting is prepared to form a cake the sheets are placed one upon another, and to the upper side of every alternate sheet a thin veneer is applied, said veneer being formed from a thin, transparent sheet, suitably colored. The color in the present instance is of the kind known as 'ruby.' The veneer is attached to the sheet by passing them together between the calendering rolls. The sheets are then cut up into strips, each of the latter measuring about two inches from top to bottom. Being cut from the flat side of the sheet they are easily manipulated and bent to any desired shape. They are then 'laid up' in the press, the strips having veneer attached being so placed that the veneer sheet rests on its edge, and with substantially equal intervals between the veneers. When the cake is formed the finished sheets are cut, or planed, from the top of the cake, so that the sheets of veneer will appear therein as fine lines, or bands, of color running across the face of the sheet. The strips may be laid in various ways, and with the veneer at any distance apart, so that a great variety of novel effects may be produced. * * * I have stated that the sheets are cut into strips of about two inches from top to bottom, these being laid up in the press to form a cake, strips having veneer attached being inserted at regular intervals. It should be mentioned that the thickness and width of these strips are matters which are left to the judgment and taste of the manipulator, as they are capable of an infinite variation without departing from my invention. * * * What I claim is—

1. The method described for manufacturing pyroxyline compounds in imitation of agate and similar minerals, said method consisting in forming sheets of said compounds of suitable colors and mottling, attaching a colored veneer to the upper face of the upper sheets, cutting said sheets in strips, laying up said strips in the press with the veneers upon their edges and at suitable in-

tervals, pressing the whole into a cake and cutting, or planing the finished sheets from said cake, substantially as described.

2. The method described for producing pyroxyline compounds in imitation of agate, the same consisting in forming strips of said compound of suitable colors, attaching to a suitable number of such strips thin sheets of colored veneer, laying up said strips in a press with the veneers at stated intervals and arranged upon their edges, pressing the whole into a cake and cutting the same into sheets, substantially as described.

3. As a new article of manufacture, a sheet of pyroxyline compound in imitation of agate, consisting of suitably colored portions separated by lines of different colors, said lines being formed of thin portions of a similar compound of different color united in a homogeneous mass with the other parts, substantially as described."

By the method above described the veneer containing the coloring matter used for producing the veined or streaked effect in imitation agate is placed on and by pressure in the calender rolls attached to the upper side of each alternate sheet of celluloid in a series of sheets from which the "cake" is to be formed. The sheets are then cut into strips and the latter are placed on edge in a press whereby substantially equal intervals are left between the veneering in the alternate sheets as contained in the strips. When the "cake" is thus formed the finished sheets are cut or planed from its top and disclose the veneer "as fine lines, or bands, of color running across the face of the sheet." By this method the veins are either lines substantially straight and parallel to each other or curved lines substantially corresponding in curvature and direction. The irregular veins or streaks in the natural onyx, it is true, cannot be imitated by this method. By the method of the patent in suit the imitation onyx base is formed before the insertion of the coloring matter representing the veins and streaks. By the France method the coloring matter representing the veins and streaks is applied before the formation of the imitation agate base. It is not necessary, however, to rest our conclusion that the Stevens & Harrison process lacks novelty and invention upon the France method alone. The specification in letters patent No. 211,860, dated February 4, 1879, issued to John A. Mehling, for "Improvements in Artificial Stone Veneer," discloses a method of making artificial marble and other stone which in its relation to the production of imitation veins, streaks or bands, we think is substantially identical with the method of the patent in suit. The specification in the Mehling patent is in part as follows:

"My improvements have relation to the ornamentation of wood, stone, metal or other material by the application thereto of a thin coating or veneer of artificial stone; and said improvements consist in the production of a new and useful article, as will be hereinafter first fully described, and then pointed out in the claim. The desirability and utility of a veneer of artificial marble or other stone for purposes of ornamenting mantels, wainscoting, furniture, caskets, &c., are obvious from a consideration of the inexpensive nature of the material and the highly ornamental effects which may be produced by its application. * * * In accordance with my improved method the surface which is to be veneered should be prepared in some suitable way so as to hold the marble or stone. * * * I take cement or plaster (Keene's or other suitable ground cement preferred,) mix with water to about the consistency of butter, then add colors, which must vary in accordance with the stone desired to be imitated. The colors might be mingled in the dry state with the cement. The cement is next rolled out to the thickness desired and placed upon the prepared surface to be ornamented, or it may be rolled directly upon this surface, as is desirable in many cases. * * * To produce a veneer

which shall represent an inlaid surface, as in Fig. 1, I roll out the material, as before, to any thickness required, and cut out the places to be filled with a chisel or similar implement. The places thus left are filled with other material made to represent different stones. This cutting should be accomplished while the material is yet plastic; or, if done when it is hard, the body-coating must be made wet, by which it is soon softened, and the filling should immediately follow. The surface is then dressed off, and, when dry, may be polished as before. Instead of cutting through the veneer, I find it preferable in some cases—as when several pieces are to be made of the same design—to stamp the required indentations in the plastic material by use of a surface having corresponding ribs or projections; or, if the material has already hardened, the outlines of the design to be inlaid may be cut with a knife in stamp shape. This is much quicker and gives more uniform results. Into the indentations thus produced the required inlay material is placed, and the whole finished off as before. So far as the invention is concerned, it is intended to employ any of the known bases for the artificial stone, except, of course, such as will not admit of manipulation as explained."

That the Mehling method relates to cement while that in question relates to celluloid or other pyroxyline compounds is a wholly immaterial difference. The two methods cannot be distinguished from each other in their relation to the production of artificial veins, streaks or bands. In each the base is first formed. In each the base while plastic is then cut or has the required indentations stamped in it. In each the coloring matter is then inserted in the cuts or indentations, as the case may be, to produce the desired imitation. The solidification of "the whole into blocks, shapes or masses, substantially as described," after the insertion of the coloring matter in the cuts, clearly does not disclose either patentable novelty or invention. We feel constrained to hold that the presumption in favor of patent No. 546,360, has successfully been rebutted.

The Thurber & Schaefer patent, No. 542,452, relates to an "Improvement in Celluloid Articles and in the Process of Manufacturing the Same." The claims are as follows:

"1. The process of manufacturing articles of celluloid or similar material, consisting in, first, serrating, or otherwise irregularly forming, the edge of the blank, and then subjecting the said blank to the action of dies to form the flaring crinkled rim or border of the finished article, substantially as described.

2. A finished dish or plate made of celluloid, or similar material, having a body and a flaring crinkled rim or border, the edge of said rim or border being serrated or otherwise irregularly formed, and having the same edge as that of the blank from which the dish or plate was formed, substantially as described."

The defendant as early as the summer of 1893 manufactured and sold celluloid boxes, baskets and trays with flaring and crinkled or fluted rims or borders. A sheet or blank of celluloid of the proper size was placed between the parts of a die, subjected to heat and rendered soft or plastic, and then pressed in the die, with the result that such portion of the sheet as was not in contact with the die became flaring and fluted or crinkled. The material upon cooling became hard and any superfluous material in the rim or border was trimmed off by the use of a knife or saw. By the method of the patent in suit the blank is given a serrated or irregular edge before it is placed and pressed in the die. By the defendant's former method whatever ornamentation or finishing was given to the edge was imparted after the action of the die upon the blank. In view of the prior state of the art we fail to discover invention either in the product or method of production claimed in patent No. 542,-

452. Exception is taken by the complainant to the first, second and third assignments of error as being too general, vague and indefinite. The nature of the decree appealed from is such as to render greater particularity unnecessary, if not impracticable. Having reached the conclusion that the patents in suit for the reasons given cannot be sustained, no opinion is expressed on the contention by the defendant that the method described in claims 1 and 2 of patent No. 546,360, includes merely a series of mechanical manipulations and as such is not patentable.

The decree below is reversed with costs.