23 C.C.P.A.(Patents)

### SWAN v. THOMPSON (two cases).
### THOMPSON v. SWAN.
### HOLTZMAN v. SAME.

Patent Appeals Nos. 3542, 3543, 3545, 3546.

Court of Customs and Patent Appeals.

Jan. 6, 1936.

Rehearing Denied Feb. 17, 1936.

William G. McKnight, of New York City (Horace A. Dodge, of Washington, D. C., and Drury W. Cooper, of New York City, of counsel), for Swan.

H. W. Kenway, of Boston, Mass. (F. S. Appleman, of Washington, D. C., and Henry R. Ashton, of New York City, of counsel), for Thompson and Holtzman.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

BLAND, Associate Judge.

These cases bring before us for consideration the decisions of the Board of Appeals of the United States Patent Office in three interferences. There are four appeals, involving four interference counts.

Priority of the subject-matter of the single count in interference No. 60,844 was, by the Examiner of Interferences, awarded to Thompson. The Board of Appeals affirmed the action of the Examiner of Interferences. In Patent Appeal No. 3542, Swan seeks reversal of the decision of the Board, awarding priority of the subject-matter in the single count to Thompson. This interference will be referred to as interference A.

In interference No. 64,402, involving a single count, the Board affirmed the Examiner of Interferences in awarding priority to Swan. Appellant Holtzman was involved in this interference, and he appealed in Patent Appeal No. 3546. This interference will be known as interference B.

In interference No. 64,285, there are two counts. Priority of the subject-matter of count 1 was awarded to Swan. Thompson appealed in Patent Appeal No. 3545. Priority of the subject-matter of count 2 was awarded to Thompson, and in Patent Appeal No. 3543 Swan appealed. As to both counts the Board affirmed the action of the Examiner of Interferences. This interference will be referred to as interference C.

The counts in the three interferences read as follows:

"Interference A.

"A safety razor comprising a flexible and elastic blade of oblong contour and internally apertured to receive positioning and clamping means, a guard member adapted to support the blade adjacent to the side edges of the latter, a transversely-concaved blade-clamping cap provided with parallel side edges, means for positioning the blade between the cap and the guard member, and means for clamping said parts together and simultaneously causing the side edges of the cap to flex the blade transversely on the guard member as a fulcrum, the blade being provided with unsharpened ends and with reentrant recesses located at its corner portions respectively and each extending both longitudinally and transversely of the blade and cap to such an extent as to span the corresponding cap corner and provide a clearance space of sufficient area to receive said cap corner *if bent toward the guard member, whereby a bent cap corner is prevented from exerting pressure on the blade while being flexed or when clamped and thereby breaking the blade or distorting its cutting edge.*" (Italics ours.)

"Interference B.

"A safety razor of the double edge type comprising a guard, a cap, a flexible blade and means for clamping the blade between the cap and the guard in curved position, the guard, the cap and the clamping means constituting a holder for the blade, said blade being symmetrical with respect to a longitudinal center line and having cutaway corners providing lateral blade portions having ends at right angles to said center line and more centrally disposed portions extending longitudinally beyond the lateral portions, said guard having fulcrum edges a given distance from the

longitudinal center line, said cap having side edges further from the longitudinal center line than the fulcrum edges, the blade being bent by the cap on the fulcrum edges as pivots, the ends of the lateral blade portions extending substantially between the side edges of the cap and the fulcrum edges and projections on one of the holder members in juxtaposition to the cut-away corners.

### "Interference C.

"1. A safety razor of the double edge type comprising a guard, a cap, a flexible blade and means for clamping the blade between the cap and the guard in curved position, the guard, the cap and the clamping means constituting a holder for the blade, said blade being symmetrical with respect to a longitudinal center line and having cut-away corners providing lateral blade portions having ends at right angles to said center line and more centrally disposed portions extending longitudinally beyond the lateral portions, said guard having fulcrum edges a given distance from the longitudinal center line, said cap having side edges further from the longitudinal center line than the fulcrum edges, the blade being bent by the cap on the fulcrum edges as pivots and the ends of the lateral blade portions extending substantially between the side edges of the cap and the fulcrum edges.

"2. A safety razor comprising a flexible and elastic blade of oblong contour and internally apertured to receive positioning and clamping means, a guard member adapted to support the blade adjacent to the side edges of the latter, a transversely-concaved blade-clamping cap provided with parallel side edges, each of the aforesaid parts being symmetrical about a longitudinal center line, the side edges of the cap being further apart then the side edges of the guard member, means for positioning the blade between the cap and the guard member, and means for clamping said parts together and simultaneously causing the side edges of the cap to flex the blade transversely on the side edges of the guard member as fulcrums, the blade being provided with unsharpened ends and with reentrant recesses located at its corner portions respectively and each extending both longitudinally and transversely of the blade and cap to such an extent as to span the corresponding cap corner and provide a clearance space of sufficient area to receive said cap corner *if bent toward the guard member, whereby a bent cap corner is prevented from exerting pressure on the blade while being flexed or when clamped and thereby breaking the blade or distorting its cutting edge.*" (Italics ours.)

As is indicated by the counts, the invention relates to safety razors and the blades therefor, and the particular structure, as defined by the counts, concerning which the controversy arises, is in the construction of a safety razor blade with reentrant recesses located at the corners of the blade, and corresponding cap corners on a guard member. The chief question involved in the appeals, we think, is whether or not Swan had completed the invention defined by the counts prior to Thompson's filing date. The facts are not in serious dispute, but the conclusions to be drawn from them and the proper application of the law to them are matters of much controversy.

Prior to January, 1927, in England, Swan designed and caused to be made several razors and razor blades which he claims showed a complete conception and reduction to practice, as far as their structure was concerned, of the invention of all the counts at bar. In England he filed two provisional applications for patents on the razors and blades, one of which, he thinks, and we think, discloses the invention defined by the counts at bar. In 1927, Swan was granted a design patent in England showing the razor blade described in his application here involved. In January, 1927, Swan came to this country and brought with him a gold plated razor known as Exhibit 3, with guard lugs at the ends of the cutting edges of the blade when the blade was inserted, as well as blades, known as Exhibits 4, 5, and 6, each of which blades had cut out corners and each of which fitted the razor, Exhibit 3. He also, at the same time, brought a razor, Exhibit 7, with similar guard lugs, and a blade, Exhibit 8. Exhibit 8 had cut-out corners and fitted said razors. He came to this country for the purpose of selling his invention, and in an effort to do so called upon the party Thompson, who was associated with the Gillette Safety Razor Company, and others not associated with said company. Swan did not at that time dispose of his invention.

The Gillette Safety Razor Company is the owner of the Thompson and Holtzman applications here involved, and both these

parties are represented here by the same counsel.

On April 25, 1929, Thompson filed his application for a patent. Swan's application was filed October 17, 1930, and that of Holtzman was filed August 30, 1930. Holtzman took no testimony, and, therefore, is restricted to his filing date for conception and reduction to practice.

One or more of the counts involved are quite similar to the claims found in the Thompson application. The party Thompson in his brief stated that on October 7, 1930, "the Examiner *suggested to Arthur E. Swan* the claim which appears as the count of" interference A, said Arthur E. Swan then having in the United States Patent Office a pending application which resulted in patent No. 1,802,289, and that on October 17, 1930, there was filed in the application of said Arthur E. Swan an affidavit made by Harry Swan (party in the instant cases) referring to a blade which he (Harry Swan) had introduced into the United States in 1927. (Italics quoted.)

Swan introduced the testimony of a number of witnesses for the purpose of showing what work he had done in England on the razors and blades which he brought into this country in 1927, and also the testimony of a number of other witnesses to whom the razors and blades were shown in this country. All this testimony was for the purpose of showing that when he brought the razors and blades into this country, he was in complete possession of the invention involved in the counts in issue, and that Thompson obtained the invention from him.

That Swan brought into this country, in 1927, the exhibits above referred to, which consisted of razors with guard lugs and blades therefor having re-entrant recesses fitting around the guard lugs, showed them to others, some of whom shaved with them, and that Swan attempted to dispose of his invention at that time, cannot be, and, we think, is not, seriously questioned here. In view of these facts, we deem it unnecessary to discuss in detail the testimony of each witness. That Swan brought in the razor exhibits, 3 and 7, and showed them to Thompson and left them with him, and that Thompson showed them to others in the Gillette Safety Razor Company factory, is not disputed. Thompson denies seeing any kind of blade fitted in the razors. Thompson also expresses some doubt as to the member called the bridge being connected with the razors when he saw them. He admits returning the razors a few days after receiving them with a letter in which he states that he was in receipt of "a cap and guard and wheel," but that he was of the impression that the statement was erroneous and that he should have said he received a "guard with wheels."

There is no contention here that the counts do not read upon Swan's disclosure in his application at bar. The important question is, as we see it, whether or not Swan's proofs show that Swan, prior to Thompson's filing date, had completed his invention. Thompson relies upon his filing date as the date of his conception and reduction to practice, having taken no proof in this connection. Other less important questions are involved and will be considered hereinafter.

The Examiner of Interferences and the Board held that Swan had not proven either by the testimony of his witnesses or by the exhibits that he had reduced to practice the invention of the count of interference A and count 2 of interference C before Thompson's filing date. It will be noticed at this point that the sole count in interference A and count 2 of interference C contain the following provision at the end thereof: "* * * And provide a clearance space of sufficient area to receive said cap corner if bent toward the guard member, whereby a bent cap corner is prevented from exerting pressure on the blade while being flexed or when clamped and thereby breaking the blade or distorting its cutting edge."

Swan in his provisional applications made no mention of the fact that his construction as above set forth would have the effect, in event a cap corner was bent, of preventing pressure being exerted on the blade thereby distorting or breaking the blade, and we think the record fails to show that Swan, when in this country in 1927, claimed that his structure would perform this function. In one of the provisional applications is found the following language:

"Guards may be provided at each corner of the blade so as to prevent any risk of the corner of the blade catching in the skin. Such guards may comprise lateral projections at the ends of each side of the upper plate or platform which projections extend substantially level with or slightly beyond the edge of the blade and are located at the corners thereof. Other forms of

guard may however be combined with the cover plate which clamps the razor blade upon the platform or in any other desired manner. * * *

" * * * If desired suitable recesses may be provided in each corner of the blade so as to permit the projecting corner guards to engage therein so as to more effectively screen the corners of the blade without obstructing its use during shaving.

It seems to fairly appear from the evidence that the recessed corners of the blade and their relation to the guards in Swan's structure were at the time of filing his provisional applications, and as far as the record shows prior to the filing of the instant application, intended to provide a means whereby the projecting corner of the blade would not cut the face of the user of the razor in which he used the recessed-corner blade. The important features of Swan's razor (as distinguished from the blade) described in his provisional applications, as well as in the application here involved, consists of certain diagonal guiding discs with guard lugs at the end of the cutting edges of the blade. The guiding discs are small wheels or rollers set at an angle of 45°, and are intended to cause the razor when drawn across the face to travel at an oblique angle, which Swan states is the proper natural movement for a blade to properly work in shaving. Swan's construction with reference to the re-entrant recesses and projecting guard was aimed, we think, at solving the problem of preventing the face being cut during the said diagonal traveling movement of the razor, owing to the exposed corners of the razor blade.

From what the Board stated in its decision in interference A, and from its decision in awarding Swan certain counts involved in the other interferences, it seems evident that the language of the count above quoted with reference to the bent cap corners preventing pressure so as to break the blade was regarded as a material feature of the count, the full usefulness of which Swan did not appreciate. The Board concluded that as to the count in interference B and count 1 of interference C, which did not contain the above-quoted language which is found in the count in interference A and count 2 in interference C, Swan had made a complete reduction to practice. It must be remembered that the holding of the Board as to Swan's not being in possession of the invention of the count in interference A and of count 2 of interference C, in which Swan was denied priority, is based upon the same evidence as were the holdings as to the counts which were awarded to Swan.

It is stated by Swan and not disputed here that the drawings of the blade and the razor in his application before us were made from the razors and blades which constituted the articles which he brought into this country in 1927. A comparison of the exhibits and the drawings would seem to verify this statement. There is no question raised in this court that the counts do not read upon the disclosure in the application.

We think that all the counts in the interferences at bar read upon Swan's Exhibits 3 and 7 when used with the blades, Exhibits 4, 5, 6, and 8, that the utility of the razor and blades had been tested, and that when he disclosed them in this country he was in complete possession of the invention expressed in the counts, and it is our view that it was immaterial whether he, at that time, realized that his re-entrant recessed razor blade and guard arrangement had new and useful results other than those which he at that time claimed.

It is true that the Board assigned certain reasons for concluding that the structure of Swan's Exhibit 3 and Exhibit 4 did not satisfy the terms of the single count in interference A and count 2 in interference C. It used the following language:

"Swan's Exhibit No. 3 is a razor wherein the ends of the cap terminate approximately in alignment with the ends of the cutting edge of the blade, Exhibit No. 4. The cap of Exhibit 3 and blade No. 4 appear to be so nearly of the same length that very close measurement would be necessary to detect any difference. In order to satisfy the terms of the count it appears to us that more extended length of cap would be necessary as compared to the edge of the blade in order that it might overhang the end of the blade further. The cap in Exhibit No. 3 is regarded as doubtfully satisfying these conditions. Exhibits 3 and 4 resemble the showing in Figs. 1 to 9 of Swan's drawing but it is noted that the margin of the cap shown in Fig. 1 of Swan's drawings is longer than the blade and has more of excess length than is true of Exhibit No. 3 with relation to blade, Exhibit No. 4. This question has no bearing on Swan's right to make a claim

in his application since figures 10, 13 and 15 of Swan's case disclose a structure wherein the corners of the cap overhang to a considerable extent the cut-out corners of the blade.

"So far as set forth in Swan's application there was no occasion for any over-hang cap in Figs. 1 to 9 and we believe Exhibit 3 with blade, Exhibit No. 4, was merely along the line of demonstrating the diagonal guiding discs and guard lugs at the ends of the cutting edge of the blade. As noted by the Examiner there was therefore no need in Exhibit No. 3 for any overhang of the cap and as further found by the Examiner, Swan's proofs fail to disclose any conception of this essential feature of the count or any disclosure of it to others in connection with Exhibit No. 3 and the testimony concerning it does not serve to support any claim for Swan in connection with the count of this interference."

The Board also held that the razor, Exhibit 7, and the blade, Exhibit 8, did not constitute a combination which amounted to reduction to practice of the details of the count in interference A. This holding, as was the aforesaid holding as to Exhibits 3 and 4, was followed in awarding priority of invention of count 2 in interference C to Thompson. The Board said: "* * * The cap in Exhibit No. 7 appears so very loosely mounted on the other parts, that if a corner of it should have been bent * * * It appears that it would have resulted in an objectionable condition of blade which would have been inoperative or dangerous to shave with. * * *"

We are not in accord with the views of the Board as to its finding as to the two razors and the respective blades which are shown to have been used together. They satisfy all the provisions of the counts including the re-entrant recesses located at the corners of the blades, as well as the provision "to span the corresponding cap corner and provide a clearance space of sufficient area to receive said cap corner." The shoulders or guard lugs appear on the razor exhibits, and in our judgment perform the exact function which is claimed for the cap corners and cut-out blade corners in the Thompson structure and as is called for by the counts.

At this point we think it important to consider the contentions of the party Thompson in this court. While Thompson makes certain contentions similar to the findings of the Board with reference to the structure not meeting the requirements of the counts, his chief contention is that Swan did not attempt to solve the same problem which Thompson claims to have solved, and that he had no conception of so constructing a razor blade and guard that the re-entrant recesses and cap corners would prevent the undesirable results which would flow from a bent cap corner. Thompson urges that curing this defect was of vast importance to the Gillette Safety Razor Company, and he testified that one night he awoke from a sound sleep and the idea came into his head that the solution of his problem was to cut a recess in each corner of the blade so that damaged cap corners would not come in contact with the blade. He then conceived the notion of thickening the cap corners. It is not denied that this was long after he had seen Swan's razor.

Swan claims that Thompson obtained the invention from him. The tribunals below found to the contrary, and it is not necessary, in view of our conclusion that Swan was the first inventor of the subject-matter of the counts here involved, to pass upon this question, although it is not thought erroneous to state that if Swan's record proofs are to be accepted as true, the first notion of a re-entrant recessed corner razor blade must have come to Thompson when he saw this identical feature in the Swan construction in 1927. It is entirely probable that if Thompson saw the Swan structure he did not realize that it solved the problem which he stated had confronted him throughout the years, and it is also probable that he at no time before the night when he states the conception came to him realized that the Swan structure would be helpful in the solution of his said problem.

 Swan, having completed the structure embodying the issue of the counts and disclosed it to others, and found it to be useful for any purpose, should not be deprived of the benefits flowing therefrom because another entering the field later has found that additional beneficial results could be obtained from it. Weis v. Woodman, 65 F.(2d) 274, 278, 20 C.C.P.A. (Patents) 1211, 1218; In re Smith, 36 F.(2d) 302, 17 C.C.P.A. (Patents) 644. The law in this respect is quite analogous to that declared in numerous cases to the effect that one cannot claim a patentable monopoly for an old process because with it he has been enabled to

produce a new article. Brown et al. v. Piper, 91 U.S. 37, 23 L.Ed. 200; Lovell Manufacturing Co. v. Cary, 147 U.S. 623, 13 S. Ct. 472, 37 L.Ed. 307; Arlington Mfg. Co. v. Celluloid Co. (C.C.A.) 97 F. 91; In re Braselton, 51 App.D.C. 31, 273 F. 759. The courts have frequently stated that a patentee is entitled to make every use of which his patent is susceptible, whether this use was known or unknown to him. In re Downs et al., 45 F.(2d) 251, 18 C.C. P.A. (Patents) 803, 807; In re Metzger, 45 F.(2d) 918, 18 C.C.P.A. (Patents) 808, 811; Braren v. Horner, 47 F.(2d) 358, 18 C.C.P.A. (Patents) 971, 982; In re Abrahamsen, 68 F.(2d) 569, 21 C.C.P.A. (Patents) 828, 831. We think the facts and the language used by this court in Weis v. Woodman, supra, are particularly applicable. We quote:

"In view of the foregoing, we are unable to perceive that appellant had any other conception than that of a particular function accomplished by a structure made pursuant to the suggestion of appellee, which function may or may not have been known to appellee. We accept as a fact that appellant was the first to discover the utility of cushioned edges to insure effective gripping by the frame members of the screen.

"Mere discovery of an additional function in a device invented by another does not constitute invention. In re Smith, 36 F.(2d) 302, 17 C.C.P.A. [Patents] 644."

We think that the same facts which the Board held showed Swan's reduction to practice of the issue involved in the counts awarded to Swan also showed reduction to practice of the invention of the counts awarded to Thompson. It is freely admitted on both sides in the argument here that all four counts involved in these three interferences concern only one invention, and both sides frankly stated that Swan is entitled to an award of priority of all the counts or none of them.

While, as above stated, the record shows that some of the exhibits Swan brought from England were tested, shaved with, and shown to others, it is not shown that he either bent a guard corner down or tested the recessed blade with a bent-down corner in order to ascertain if the blade would be flexed. In view of the obvious fact that the blades in the exhibits referred to could not come in contact with a corner, if bent, it would appear to be wholly unnecessary to make this character of test, and, therefore, actual testing of the exhibits to determine whether or not the blade would flex against a bent corner was unnecessary.

Thompson argues that Swan had abandoned his British applications, and that he, through his brother, Arthur H. Swan, who had access to Thompson's file wrapper, obtained the terms of the counts involved here and was prompted from that fact to eventually claim the invention. It is not pointed out very definitely just what effect this alleged situation may properly have on the decision of the issue involved, but we think it is probably pressed with a view of urging the applicability of the doctrine akin to equitable estoppel announced in Mason v. Hepburn, 13 App.D. C. 86.

Thompson contends that the record shows that Swan neglected the invention in issue in favor of other enterprises, and that he was not concerned with this invention, even the diagonal stroke feature of his razor, until he learned of Thompson's success through certain advertisements of the Gillette Safety Razor Company.

The Board of Appeals in its decision awarding Swan the count in interference B and count 1 of interference C summarily dismissed Thompson's contention with reference to equitable estoppel by stating (in interference B) that it had not been established that Swan's activities amounted to an abandoned experiment, and that there was no concealment or suppression on the part of Swan. We agree with this conclusion. The facts in this case afford no proper basis for the application of the doctrine akin to equitable estoppel which deprives the first inventor of his right to a patent.

For the reasons heretofore assigned, we conclude that the Board of Appeals was in error in affirming the action of the Examiner of Interferences in awarding priority of invention in the count in interference A and count 2 of interference C to Thompson, and the decisions appealed from in Patent Appeal No. 3542 and Patent Appeal No. 3543 are reversed. It correctly awarded priority to Swan in the count in interference B and count 1 in interference C, and the decisions appealed from in Patent Appeal No. 3545 and Patent Appeal No. 3546 are affirmed.

Reversed in Patent Appeal No. 3542; reversed in Patent Appeal No. 3543.

Affirmed in Patent Appeal No. 3545; affirmed in Patent Appeal No. 3546.