## VISCHER PRODUCTS CO. v. NATIONAL PRESSURE COOKER CO.

Civil Action No. 1310.

District Court, W. D. Wisconsin.

April 24, 1947.

The attorneys for the plaintiff were Spohn, Ross, Stevens & Lamb, of Madison, Wis., and Hinkle, Horton, Ahlberg, Hansmann & Wupper, of Chicago, Ill.

Defendant's attorneys were Francis J. Wilcox and Phillip Breitman, both of Eau Claire, Wis., Samuel H. Maslon and Paul, Paul & Moore, of Minneapolis, Minn.

STONE, District Judge.

This is an action brought by plaintiff against defendant for infringement of Claims 6, 7, 8, 9 and 10 of Patent No. 2,301,724 issued to plaintiff on November 10, 1942, on application dated May 18, 1938.

The claims in issue, set forth in the margin, are for alleged improvements in pressure cookers and a pressure relief device.[1]

Defendant denies the validity of the said claims and their infringement.

Pressure cooking is an old art. It is a method of preparing food in a closed vessel, from which air has been expelled, and in which steam pressure is generated from a source of heat. By increasing the pressure in a cooking container, the temperature inside the vessel can be raised beyond the usual boiling point of water, 212° F. A desirable and commonly used pressure in pressure cookers is fifteen pounds per square inch. At that pressure a temperature of 250° F. can be reached within the container. Cooking food at this tempera-

[1] Claims:

6. In a pressure cooker formed of a closed container having an aperture therein, means for relieving the pressure when it attains a predetermined value, comprising an imperforate synthetic rubber element closing said aperture, said element having a flange engaging part of said container around said aperture thereby to hold said element in position to close said aperture until said predetermined pressure is attained, said flange being sufficiently elastic to yield when said pressure is attained and to permit said element to be forced from engagement with said container part.

7. In a pressure cooker formed of a closed container having an aperture forming a passageway for the escape of steam from the container, said aperture being in a part having an inwardly facing seating surface around it, means for maintaining the pressure within the container until it attains a predetermined value and then relieving the pressure, comprising an element closing said aperture, said element being made of a soft rubber-like material capable of withstanding temperatures in the order of the boiling point of water and being highly resistant to deterioration by oils and greases, said element having the peripheral portion thereof engaging and held against said seating surface by a force derived from the fluid pressure within the container, the portion engaging said seating surface being sufficiently elastic to yield when said element is subjected to a predetermined pressure, and thereby permit said element to be forced from its position closing said aperture.

8. A pressure cooker comprising a container having an opening therein forming a passageway for the escape of steam therefrom to the atmosphere, and an element normally closing said opening, said element being made of a synthetic rubber-like material capable of withstand-

ing temperatures in the order of those of the boiling point of water and being highly resistant to deterioration by oils and greases, said element being sufficiently elastic that when subjected to steam pressure in the container in the order of fifteen to twenty pounds per square inch, it will yield and be deformed to permit escape of steam from said container through said opening.

9. The combination of a closed vessel subjected to internal fluid pressure caused by boiling aqueous material therein, and having an aperture above the level of said aqueous material, and a soft resilient safety plug having a flange to engage the inside of said vessel normally sealing said aperture and proportioned to be ejected therefrom by said fluid pressure when said pressure exceeds a predetermined maximum value, thereby to re-release said pressure, said plug being composed of a synthetic rubber resistant to deterioration and change in elastic properties by the action of grease and temperatures in the order of 260° Fahrenheit.

10. The combination of a container for cooking foods under pressure, said container having an aperture and being subjected to fluid pressure generated by heating of the fluids therein, and a safety pressure relief device comprising a closure element of a synthetic rubber which does not materially change its elastic properties under the influence of grease and temperatures in the order of 260° Fahrenheit, said element normally preventing the flow of fluid through said aperture and having a flange engaging and held against a seating surface on said container, said flange being proportioned to be disengaged by the influence of a dangerously high pressure in said container to permit fluid to flow through said aperture, thereby releasing said pressure.

ture in a pressure cooker requires a much shorter period of time than ordinary cooking, avoids oxidation of the food and is alleged to preserve vitamins, minerals and food values ordinarily lost in other methods of cooking.

The pressure relief device disclosed in the patent in suit is a synthetic rubber plug which seals an aperture in the cooker cover under ordinary cooking pressures. When an excessive pressure, which may be predetermined, is reached, the rubber device is distorted by the pressure, the portions of the plug seated around the aperture being pulled away therefrom, and the plug is expelled, opening the hole in the cover and releasing the excess pressure. If it is blown out it may be reinserted in the cover for further use.

Plaintiff first sold its pressure cooker with the Vischer pressure relief plug in 1938. Thereafter, in 1944, it learned that defendant was using on its pressure cooker as an auxiliary pressure relief device a short metal tube screwed into an aperture in its cooker cover, at the top of which tube the metal was cut away to form an overhanging lip or seating surface, over which was placed a synthetic rubber cap having in its interior a flange which engaged the underside or seating surface of the metal lip. Under excessive pressure, the cap would be distorted, pulling the flanges away from the seating surface. The cap would then be blown off, opening the aperture and releasing the pressure. This plug is marked Exhibit No. 27.

In October 1944 defendant commenced the manufacture of a pressure relief valve in a second and different form. In this form an aperture is made in the cooker cover on the inner side of which are formed little ears or lugs. A synthetic rubber disc, larger than the aperture, is inserted between the ears and the aperture. When pressure is built up within the cooker, the disc is forced upwardly so that its outer edges seat against the surface of the cover around the aperture, sealing it. When excessive pressures are produced, the disc becomes distorted, the edges pulling away from the seating surface around the aperture, and the disc is forced through the hole in the cover, opening it and re-

lieving the pressure. This plug is illustrated in Exhibit No. 29.

On discovery of the alleged infringement and prior to the commencement of this action, notice was sent by plaintiff to defendant, charging that both forms of defendant's device infringed plaintiff's patent.

In this action, Claims 6, 8 and 10 of the patent in suit, No. 2,301,724, are charged to be infringed by defendant's first form of structure. Exhibit No. 27. Claims 6, 7, 8, 9 and 10 of said patent are charged to be infringed by defendant's second form of structure, illustrated in Exhibit No. 29.

The pressure relief devices of both plaintiff and defendant are made of Neoprene, a synthetic rubber, which was not invented by plaintiff but was known to the art as early as 1931, when it was then foreseen that it could be used as a resilient product in the manufacture of "diaphragms", "valves" and "valve discs". Both plugs are designed to blow out and do blow out at a pressure in excess of thirty pounds. The plugs can be made from either natural or synthetic rubber, but synthetics such as "Duprene", "Neoprene" and "Perbunan" are claimed to be preferable because of their alleged superior resistance to oils, greases, heat and oxidation.

There is no evidence in this record that any pressure cooker was ever sold or used without a pressure escape device. It does appear from the evidence that prior to the application for the patent in suit, all pressure cookers offered to the public were equipped with an auxiliary pressure escape valve in addition to the service valve that was intended to operate at a higher pressure than ordinary cooking pressure. The auxiliary pressure relief devices then and now in use included the ball and spring service valve, the gravity type valve and the fusible plug. In the ball and spring device the ball is held in place over a hole in the cover by the tension of two springs, and blown from its seat by excessive pressure. The gravity type valve is simply a weight over a hole, without springs, that operated by gravity. The fusible plug was, prior to 1938, and is now extensively used in pressure cookers. It is a practical and an efficient plug. It is a metal plug inserted in the cover of the cooker and has a

core of soft alloy metal that melts when the temperature gets high enough, opening a hole in the cover to release excess pressure. There is no proof in the record that any of the foregoing plugs failed to operate under excessive pressure. Both temperature and pressure affect the release of either a fusible or rubber plug.

Defendant makes several objections to the validity of the claims in suit; namely, that the claims are invalid for want of invention over prior art; that they are invalid because of their functional limitations without adequate, full, clear and concise descriptions as prescribed by R.S. Sec. 4888, 35 U.S.C.A. § 33, and that they are drawn to an exhausted combination.

■ Plaintiff relies much upon the presumption of validity. However, the presumption is no stronger than the facts upon which it is founded. The facts do not support this claimed presumption. The Examiner in the Patent Office rejected all of Vischer's claims as showing no invention over Weil, Carlsson and Nelson. Representations of fact were made to the Board of Appeals that are not found in this record.

Vischer represented to the Board of Appeals that it was not and is not unusual to read of injuries, sometimes fatal, from explosions of pressure cookers; that these explosions made it necessary for manufacturers to secure insurance "at high premium rates" to protect themselves against claims arising out of such accidents; that by virtue of his invention the hazard incidental to the use of pressure cookers had practically disappeared so that insurance can be obtained at a nominal premium rate. There is no evidence in this record about insurance rates, and no witness has identified by name or address, any person as having suffered injury or damage as a result of operating a pressure cooker equipped with a pressure relief device. The plaintiff's brief filed with the Board of Appeals contained the language:

"Insofar as the actual shape of the plug is concerned, there are but minor differences between applicant's safety device and the Carlsson stopper. The Carlsson stopper is, however, described in the patent as being made of rubber, whereas, the safety relief plug of the application is defined as made of a soft 'synthetic' rubber, such as 'Duprene' or 'Neoprene'. The *primary and critical structural differences* between the Carlsson stopper and applicant's pressure relief device is this *difference in the materials* of which the plugs are made."

At the trial the plaintiff readily admitted that Vischer had not invented synthetic rubber, and that no claim is made to exclusive rights to the synthetic rubber; that efficient cooker plugs can be made from either natural or synthetic rubber compounds; that the Carlsson patent provides that although it shows a rubber structure "any other material possessing the desired resiliency may be employed." The argument made to the Board of Appeals as to the "primary and critical structural differences" was abandoned by plaintiff before this court. To the Board of Appeals the patentability of Vischer's claims as to the pressure relief device was predicated and based upon the use of synthetic rubber. The representations so made by Vischer were strong, convincing, but erroneous, and not supported by the evidence adduced at this trial.

A part of the opinion of the Board of Appeals reads as follows:

"While relief valves on pressure cookers were old as shown by the art, undoubtedly *appellant's synthetic rubber plug* has numerous advantages and we are not satisfied that those skilled in the art would have been apt to have received any suggestion from Carlsson of employing a stopper of the shape shown therein for the new purpose."

The Board of Appeals was undoubtedly misled by Vischer's representations and argument.

Figure 1 of Carlsson's Patent, No. 1,014,-450, issued January 9, 1912, shows a plug almost identical to the plaintiff's device. The difference is that it is made of natural and not synthetic rubber. It may be made of other suitable material. It has a resilient flange which may be compressed for insertion into an opening in a receptacle, the flange expanding within the receptacle to hold the stopper in place, the

construction being such that the stopper may be used repeatedly. If sufficient pressure is applied from inside the container against the Carlsson stopper, it will blow the plug out of the aperture. And that is exactly what plaintiff claims for its device in the following language:

"My invention relates generally to devices for relieving the pressure in a container when a predetermined maximum pressure is exceeded. It is an improved means for relieving the fluid pressure in a container, and an improved pressure relief or pop-off valve device."

Both the Carlsson and Vischer plugs will function as a fluid pressure relief device or as blow-out plugs. That should be obvious to any mechanic skilled in the art. To make the Carlsson plug of a grease, oil and temperature resistant material such as synthetic rubber is not invention.

■ Substitution of one material for another in a device is not invention. Sinclair & Carroll Co., Inc. v. Interchemical Corporation, 325 U.S. 327, 65 S.Ct. 1143, 89 L.Ed. 1644; Evr-Klean Seat Pad Co. v. Firestone Tire & Rubber Co., 8 Cir., 118 F.2d 600.

■ Carlsson was entitled to every use his plug could be put to, whether known or unknown to him. It is well established in Patent Law that a patentee is entitled to every use to which his invention is susceptible, whether such use be known or unknown to him.

In General Electric Co. v. Jewel Incandescent Lamp Co., 326 U.S. 242, 248, 66 S.Ct. 81, 84, the court said:

"The same result is indicated where, as in the present case, the prior art discloses the method of making an article having the characteristics of the patented product, though all the advantageous properties of the product had not been fully appreciated. Lovell Mfg. Co. v. Cary, 147 U.S. 623, 13 S.Ct. 472, 37 L.Ed. 307. Pipkin found latent qualities in an old discovery and adapted it to a useful end. But that did not advance the frontiers of science in this narrow field so as to satisfy the exacting standards of our patent system. Where there has been use of an article or where the method of its manufacture is known,

more than a new advantage of the product must be discovered in order to claim invention. See DeForest Radio Co. v. General Electric Co., 283 U.S. 664, 682, 51 S. Ct. 563, 568, 75 L.Ed. 1339. It is not invention to perceive that the product which others had discovered had qualities they failed to detect. See Corona Cord Tire Co. v. Dovan Chemical Corporation, 276 U.S. 358, 369, 48 S.Ct. 380, 383, 72 L.Ed. 610."

■ The Statute, R.S. Sec. 4886, 35 U.S.C.A. § 31, does not permit the patenting of a new use. It must be a new art.

There was no "crying need" in the pressure cooker industry for a new pressure relief device. The fusible plug was and is safe, practical and efficient. It is now widely and extensively used on a variety of pressure cookers, and had been in use long before the Vischer application was filed. Vischer made no valuable contribution to the art, that filled any existing need.

Pressure relief devices were long known to the art. Steam boilers have always been equipped with blow-out plugs.

Other types of pressure relief valves and devices were in use prior to the Vischer application. Many were used in electrolytic condensers long before 1938.

The Cole Patent, No. 2,058,773, Ex. 35, issued October 27, 1936, shows a "cork vent plug," which in the event of "destructive gas pressure" will "act as a relief."

The Pontis Patent, No. 2,227,319, Ex. 36, issued December 31, 1940, shows a "soft" metal "blow-out plug," as a venting means for excessive pressure.

The Georgiev Patent, No. 2,178,686, Ex. 37, issued November 7, 1938, shows a yieldable membrane or stop, which is "displaceable by pressure buildup within the container," so as to relieve excessive pressure within the container.

The Danziger Patent, No. 2,049,691, Ex 48, issued August 4, 1936, shows a pressure relief vent sealed by a rubber cap. This rubber cap, in form is almost identical with the first accused structure, Ex. 27. It is a small rubber nipple placed over a projection in which a hole was drilled.

The Weil Patent, No. 1,068,193, Ex. 49, issued July 22, 1913, shows a "pressure expansion safety venting disc" of metal which, in case of excessive pressure in a fluid container, will blow out and release the pressure.

The Painter Patent, No. 327,099, Ex. 50, issued September 29, 1885, shows a disc "of some suitable flexible material." He called his disc a "bottle stopper" for use with bottles or similar vessels containing fluids under pressure from effervescence or otherwise." That it could resist pressure "up to that point at which the arch will be crushed."

The form of Vischer's plug is shown in Carlsson's Patent No. 1,014,450, Ex. 40, and Bopps Patent, No. 358,959, Ex. 41. Each disclosed its use in a vessel containing fluid under pressure. Each disclosed making it of rubber or a rubber substitute. One skilled in the art would know that in the event excessive pressure developed, the resilient plug would be blown before the container burst. The feature of being capable of repeated use is inherent in both.

The defendant's plugs, illustrated in Ex. 29, are not identical in structure with plaintiff's plug.

Plaintiff's patent states that two things are necessary in its plug. First, that the portion which resists outward movement be sufficiently strong to hold the plug in position against the desired maximum pressure, and secondly, that the plug have some means to hold it in position so that the peripheral edge of the inner surface engages the inner surface of the cover and thus forms an abutment and an initial seal.

These limitations are not found in the accused device. The first form, Ex. 27, has no portion "which lies within the container." It has no portion which "engages the inner surface of the cover."

The second form, as illustrated in Ex. 29, has no portion which lies "within" the container. The entire disc forms part of the container wall and is not within it. The composition of the disc and not its diameter causes it to seal the container. The disc itself has no means to hold it in position. It has no flange such as found in plaintiff's device. It is not held in posi-

tion by any means to form an initial seal. Initially the disc is below the top surface of the cover, resting on small lugs in the aperture; steam pressure, as it develops, raises the disc to a sealing contact.

Neither of defendant's plugs embody the essentials of "shape and form" set forth in the patent in suit.

The second accused structure is a flat disc. It has no flange. Its peripheral portion is not sufficiently elastic to yield at the desired pressure of thirty-five pounds per square inch. The entire disc must bulge. This device does not infringe any of plaintiff's patent.

The Vischer plug, should be made of soft synthetic rubber, and may be made in any shape or form so long as the portion that resists outward movement is sufficiently strong to resist the desired maximum pressure, and so long as the plug has some means to hold it in position so that the peripheral edge of the inner surface engages the inner surface of the cover and forms an initial seal. That the composition of the plug is such that it will not be affected by temperature in the order of 260° Fahrenheit and is oil and grease resistent.

Claims 6 and 7 of the patent in suit are on pressure relief plugs used in pressure cookers. Claims 8, 9 and 10 of the patent are on pressure cookers.

In Claim 8 the alleged invention is simply the substituting of a synthetic rubber for the soft metal in the fusible plug.

Prior art showed the exact form of the rubber cap of the first accused structure in the Danziger Patent and the form of the Vischer plug in the Carlsson and Bopp Patents, also the flat disc in the Painter Patent.

Claims 8, 9 and 10 relate to pressure cookers with the Vischer pressure relief plug. Vischer does not claim to have invented the pressure cooker. He does claim he improved the plug in the pressure relief art. Improving one element in a combination gives no right to reclaim the old combination with the new element. It was held in Bassick Manufacturing Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251; and Lincoln

Engineering Co. of Illinois v. Stewart Warner Corporation, 303 U.S. 545, 58 S.Ct. 662, 82 L.Ed. 1008; that a patentee cannot, by improving one element of an old combination whose construction and operation is otherwise unchanged, in effect, repatent the old combination by reclaiming it with the improved element substituted for the old element. All Vischer did was to substitute the rubber blow-out plug for the fusible blow-out plug, which is not invention. Any patented device, all the elements of which are old and each of which performs the same function taught by prior art, fails of invention. Bassick Manufacturing Co. v. R. M. Hollingshead Co., 298 U.S. 415, 56 S.Ct. 787, 80 L.Ed. 1251.

The commercial success of the patent in suit has not been established. The license agreements entered into by plaintiff and the two companies manufacturing pressure cookers, included in addition to the patent in suit, six other patents or applications for patents owned by plaintiff. It was the new small four quart convenient size and type of pressure cooker, with the handy cover and locking device, showing a marked improvement over the old large type cooker with an eighteen to twenty quart capacity, with the cover secured to the container with a plurality of screw devices and clamping elements and used mostly for canning, and not the alleged improvement of the Vischer pressure relief plug that increased the public demand and sales of plaintiff's cookers and cookers made under the license agreements.

The rule of law applicable in this case is well expressed in National Pressure Cooker Company v. Aluminum Goods Manufacturing Company, 7 Cir., 162 F.2d 26. In that case, after considering the findings, the Court said:

"Assuming that plaintiff's disclosure may properly be credited with all the advantages claimed, are they such as to justify the claim of invention? While we suppose this question like many others with which courts are confronted must be determined by the particular facts of the case, yet there are some general principles announced by the Supreme Court which may well be noted. The cases to which we shall refer were all concerned with combination claims, the elements of which were old in the art, where the advantages resulting therefrom were relied upon to show invention.

"In Reckendorfer v. Faber, 92 U.S. 347, 356, 23 L.Ed. 719, the court stated:

" 'An instrument or manufacture which is the result of mechanical skill merely is not patentable. Mechanical skill is one thing: invention is a different thing. Perfection of workmanship, however much it may increase the convenience, extend the use, or diminish expense, is not patentable.'

"The principle thus announced in this old case was recently quoted with approval in Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 91, 62 S.Ct. 37, 86 L.Ed. 58.

"In Hollister v. Benedict Mfg. Co., 113 U.S. 59, 70, 5 S.Ct. 717, 28 L.Ed. 901, the court stated:

" 'This is what we ascertain to be the precise idea embodied in the invention described and claimed in the patent, and which, although we find to be new in the sense that it had not been anticipated by any previous invention, of which it could therefore be declared to be an infringement, yet is not such an improvement as is entitled to be regarded in the sense of the patent laws as an invention.'

"In Thompson v. Boisselier, 114 U.S. 1, 11, 5 S.Ct. 1042, 29 L.Ed. 76, the court in response to the contention that the apparatus was new and useful stated:

" 'So, it is not enough that a thing shall be new, in the sense that in the shape or form in which it is produced it shall not have been before known, and that it shall be useful, but it must, under the Constitution and the statute, amount to an invention or discovery.'

"In Altoona Theatres v. American Tri-Ergon Corporation, 294 U.S. 477, 486, 55 S.Ct. 455, 79 L.Ed. 1005, the court stated:

" 'An improvement to an apparatus or method, to be patentable, must be the result of invention, and not the mere exercise of the skill of the calling or an advance plainly indicated by the prior art. * * * The patentees brought together old elements, in a mechanism involving no new principle, to produce an old result, greater uniformity of motion. However

skillfully this was done, and even though there was produced a mechanism of greater precision and a higher degree of motion-constancy, and hence one more useful in the art, it was still the product of skill, not of invention.'

"In Cuno Engineering Corporation v. Automatic Devices Corporation, 314 U.S. 84, 90, 62 S.Ct. 37, 86 L.Ed. 58, the court said:

" 'We may concede that the functions performed by Mead's combination were new and useful. But that does not necessarily make the device patentable. Under the statute (35 U.S.C. Sec. 31, 35 U.S.C.A. § 31, R.S. Sec. 4886) the device must not only be "new and useful," it must also be an "invention" or "discovery." * * * Tested by that principle, Mead's device was not patentable. We cannot conclude that his skill in making this contribution reached the level of inventive genius which the Constitution (Art. I, Sec. 8) authorizes Congress to reward. He merely incorporated the well-known thermostat into the old "wireless" lighter to produce a more efficient, useful, and convenient article. (Citing case.) A new application of an old device may not be patented if the "result claimed as new is the same in character as the original result" (citing case), even though the new result had not before been contemplated.'

"Thus there may be adduced from these decisions of the Supreme Court, old and recent, that a combination patent resulting in an improvement will not be sustained merely because the apparatus described 'may increase the convenience, extend the use, or diminish expense' (Reckendorfer), or be 'new in the sense that it had not been anticipated by any previous invention' (Hollister). Neither is it 'enough that a thing shall be new in the sense that in its shape or form in which it is produced it shall not have been before known' (Thompson), or because it is 'more useful in the art' (Altoona), or even where the functions performed by the combination 'were new and useful' even though the article produced is 'more efficient, useful and convenient' (Cuno).

"It thus appears from the principles announced by the Supreme Court that an improvement or advantage resulting from a combination of old elements, especially where no new result is obtained, is ordinarily credited to mechanical skill rather than invention. This of course is no iron clad rule determinative of all situations but it does mean, so we think, that a patentee who relies upon improvement and advantage, as does the plaintiff in the instant case, occupies a precarious position when attempting to uphold the validity of his patent."

 It is clear to this court that all of the claims of the patent in suit are invalid, for the reasons herein set forth, and that the claims have not been infringed by defendant. In view of the foregoing it is unnecessary to consider defendant's other objections to the validity of the claims in suit.

Defendant is entitled to judgment dismissing plaintiff's complaint on the merits and adjudging claims 6, 7, 8, 9 and 10 of Patent No. 2,301,724 are invalid and not infringed, together with costs.